Samuel Marcus and Sarah Marcus v. Commissioner.
Marcus v. Commissioner
Docket Nos. 90590, 3069-62.
United States Tax Court
T.C. Memo 1964-206; 1964 Tax Ct. Memo LEXIS 131; 23 T.C.M. (CCH) 1240; T.C.M. (RIA) 64206; August 4, 1964
*131 Held: That petitioner was not engaged in carrying on a business of promoting corporations for the purpose of sales of the stock thereof, and that legal fees and expenses incurred by him in connection with the collection of loans made by him to certain corporations are not deductible as ordinary and necessary business expenses under section 162 of the Internal Revenue Code of 1954. Held, further, that the portion of the legal fees and disbursements paid in connection with suits which is attributable to claims for recovery of the principal of alleged loans is not deductible under section 212 of the Internal Revenue Code of 1954, but that the portion thereof attributable to claims for collection of interest on the alleged loans is deductible under section 212. The deductible amounts determined. Held, further, that the portion of legal fees and disbursements paid in a suit which is attributable to an attempted revision of the selling price of stock is not deductible as expense under section 212, but is properly to be treated as a capital expenditure to be taken into account in computing gain or loss upon the sale. Held, further, that *132 no part of the legal fees and disbursements paid to an attorney in connection with a condemnation proceeding resulting in the receipt of an award, including interest, is deductible as expense under section 212(1) of the Code. Held, further, that interest paid by the petitioner on the tax liability of a corporation of which he was a transferee is deductible by him to the extent it represented interest accrued subsequent to the receipt of corporate assets by him. Martin Rubashkin, for the petitioners. Leon M. Kerry, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1954, 1955, 1956, and 1957 in the respective amounts of $1,811.35, $4,565.85, $7,144.24, and $3,920.83. For the taxable year 1956 he also determined an addition to tax in the amount of $279.68, under section 6651(a) of the Internal Revenue Code of 1954, for failure to timely file a return. The parties having reached agreement as to some of the issues raised by the pleadings, the issues remaining for decision are whether the petitioners are entitled to deductions, under section 162 or section 212 of the Internal Revenue Code of 1954, for the taxable years 1954, 1955, 1956, and 1957 for attorney fees and other legal expenses, and whether they are entitled to a deduction for the taxable year 1954 claimed on account of interest paid. *135 Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioners are husband and wife, residents of New York, New York. They filed joint income tax returns on the cash method for the taxable years 1954, 1955, 1956, and 1957 with the district director of internal revenue for the Upper Manhattan district, New York, New York. Hereinafter Samuel Marcus will be referred to as the petitioner. Since 1915 the petitioner has participated in many business enterprises, about half of which have been concerned with some phase of photography or photographic supplies. In some instances the businesses were conducted in corporate form and in other instances as partnerships. The various companies in which the petitioner has been interested are set forth hereinafter. In 1915 the petitioner organized Marcus Photo Service for the purpose of developing and printing film for drugstores and camera stores. He sold his interest in that company in 1946. In 1931 he organized 32nd Street Fotoshop and still continues to operate it, the business having been incorporated at an undisclosed time. In 1944 he organized a partnership to engage in the *136 sale of religious articles. This partnership was later incorporated under the name of Pelco, Inc., which is still in existence. Petitioner continues to be active in the affairs of Pelco, Inc.
In 1944 the petitioner purchased a combination business and residential building, which he transferred to a corporation which he organized under the name of Masarel Realty Company. That corporation is still in existence and petitioner manages the building for it. In 1946 the petitioner organized and incorporated Cineque Color Film Laboratories for the purpose of engaging in all types of industrial color work. This corporation, of which petitioner is the sole stockholder, is still in existence. Petitioner personally manages the business. In 1945 or 1946 he organized and incorporated Duane Products for the purpose of manufacturing electric irons. He operated that company as general manager for about 2 or 3 years and then liquidated the corporation. About 1945 he organized and incorporated Projecto, Inc., for the purpose of manufacturing 35mm projectors. He was its sole stockholder. In addition to his original investment, the petitioner loaned sums of money to Projecto, Inc. In 1945 petitioner *137 formed a partnership with 2 other individuals for the purpose of purchasing surplus Government gun cameras and remodeling them for sale to amateur photographers. Petitioner managed this business. The partnership was discontinued after several years. In 1946 petitioner and another individual purchased the stock of Republic Cab Company, a corporation which owned and operated 20 cabs. Petitioner spent 3 or 4 hours a day in the business of this corporation. He disposed of his interest in this corporation in 1950. In 1946 petitioner organized Picto Mart for the purpose of manufacturing children's toys. This business was not successful and was discontinued in 1951. About 1945 or 1946 he organized and incorporated Associated Photo Products for the purpose of selling photographic products to the general retail market at wholesale. The corporation was liquidated about 3 or 4 years later. In 1946 he organized Photo Surplus Sales for the purpose of purchase and sale of surplus Government materials. He did all the purchasing of equipment and merchandising for this company. He disposed of his interest in that company in 1948. In 1947 he and another individual organized Central Photostat *138 Company for the purpose of making photostats. He was engaged in this business for about 2 or 3 years, at which time his associate took over the business. At an undisclosed time petitioner organized and incorporated East 57th Street Amusement Corporation for the purpose of taking over the business of Mocambo, Inc., a corporation to which petitioner had advanced various sums of money but which was unable to make repayment. East 57th Street Amusement Corporation was liquidated in 1950 or 1951 after petitioner realized he could not operate it profitably. About 1953 petitioner and 2 associates organized a partnership, Safut Trading Company, for the purpose of buying Government surplus electronic equipment. The petitioner and one of his associates traveled throughout the country buying such equipment. This business was operated for about 2 or 3 years and was then liquidated. About 1953 the petitioner and his 2 associates in Safut Trading Company organized a partnership known as Banor Trading Company for the purpose of purchasing surplus photographic merchandise. That company was operated until 1957. In 1954 the petitioner purchased the stock of Lance Color Film Processing, a corporation *139 engaged in a color photo finishing operation similar to that of Marcus Photo Service. Lance Color Film Processing was operated until 1957 or 1958 when it was merged into Cineque Color Film Laboratories. At an undisclosed time petitioner acquired Everready Photo Laboratories which was engaged in the business of finishing color photos. This business was assimilated by petitioner's other photo finishing companies. At an undisclosed time petitioner advanced money to Pasko Products, Inc., for which he received a 20% equity interest. The corporation was later liquidated. Petitioner's interest in this enterprise terminated about 1953. At an undisclosed time petitioner invested $15,000 as part of a real estate syndicate. At an undisclosed time the petitioner, together with two other persons, set up a ship repair business under the name of Coastal Marine Company, Inc. Petitioner handled the office work and the payrolls. Legal Expenses Incident to Milmar Suit In April 1946, the petitioner and William Miller purchased certain improved realty located at Fort Lee, New Jersey, making a down payment of cash and giving a purchase money mortgage for $300,000. Petitioner loaned Miller $50,000 *140 to make his share of the down payment. Miller gave petitioner his note dated April 1, 1946, for $50,000 payable on demand after May 20, 1947, with interest at 4%. Such note was marked "Protested 5/21/47". Thereupon Miller gave Marcus a note dated June 1, 1947, for $50,000, payable $500 per week commencing June 1, 1948, with interest at 4%. The petitioner and Miller created a New Jersey corporation, Milmar Estate, Inc., (hereinafter referred to as Milmar) to hold such property. Milmar then rented the property to Bill Miller's Riviera, Inc., which operated a restaurant and night club on the property. On December 28, 1950, a complaint was filed in the United States District Court for the District of New Jersey by Al Bierman and William Miller, as plaintiffs, against Samuel Marcus (the petitioner in the instant proceeding) and Milmar. The pleadings filed by the plaintiffs in that case allege that in August and early September 1948, Miller, Marcus, and Al Bierman were the owners of all of the stock of Milmar; that Miller's stock was pledged with Marcus as collateral for a $50,000 note; that in August 1948 Miller and Bierman reached an agreement with Marcus whereby Marcus was to relinquish *141 his interest in Milmar; that Marcus was to receive $125,000, of which $30,000 was to be paid in cash and the balance of $95,000 was to be paid in installments; that in addition Miller was to pay Marcus $15,000 in installments; that Marcus was to cancel the note of $50,000 which Miller had previously given to Marcus; that Marcus could not find the stock certificates; that, therefore, the old stock certificates were canceled on the records of Milmar and new certificates for 1,250 shares were issued, 625 shares of which were placed in escrow as security for the balance of the purchase price; that an agreement was signed on September 14, 1948; that the agreement of September 14, 1948, for the sale of the stock was made by Milmar whereas the payments were being made to Marcus; that at the time of the commencement of the suit the unpaid balance of the purchase price was $35,000; that such balance would become payable in installments bearing interest at 4% per annum; that Marcus claimed that he was entitled to these future installments and interest; that Milmar, as the nominal seller of the stock under the contract of September 14, 1948, might claim that it was entitled to such installments *142 and interest; that in the event the plaintiffs should pay the future installments to the defendant not entitled to the same, the other defendant might declare an acceleration of the entire balance and demand that the Milmar stock held in escrow be returned to the seller; and that the plaintiffs had deposited the $1,500 installment due on January 1, 1951, with interest, into the registry of the court. In the complaint the plaintiffs prayed that the court require the defendants to interplead and determine their rights to collect the installments and that upon the payment by the plaintiffs into the registry of the court of each installment as it became due the plaintiffs be adjudged to be discharged from all liabilities with respect to such installments. In his answer and counterclaim Marcus requested that the complaint be dismissed, asserting that the action was not brought by the plaintiffs in good faith, that the defendant Milmar had at no time threatened to make any claim for the proceeds of the sale of stock, and that it could not do so without active cooperation of the plaintiffs. By way of counterclaim he admitted that up to the time that he learned that fraud had been practiced *143 upon him by the plaintiffs he had claimed to be entitled to the installments constituting the balance of the purchase price, but that since becoming aware of the fraud he had rescinded all agreements to which he was a party and had elected to be restored to his original status. He alleged that the contract of September 14, 1948, was invalid in that Milmar did not own the shares of stock which it purportedly agreed to sell; that he was the unconditional owner of 625 shares of Milmar stock and was the equitable owner and possessor of an additional 480 shares held by him as security for Miller's $50,000 note; that the plaintiffs induced him to sell his 625 shares of stock by misrepresenting the true financial condition of Milmar and of Riviera, the tenant in possession of the premises; and that he had elected to rescind the contract of sale of the stock and tendered himself willing to return to the payors the sum of $90,000 thus far received by him on account of the purchase price of the stock. By way of counterclaim he alleged that he was the owner of 1,230 shares of the stock of Milmar (the other 20 shares having been assigned by him to Al Bierman) and he therefore prayed for judgment *144 that the contract of September 14, 1948, be declared null and void and that he be declared the owner and entitled to possession of 1,230 shares of Milmar stock. He also requested, by counterclaim in the alternative, that if the court should find the agreement of September 14, 1948, binding, he be paid the balance due in the amount of $35,000 together with interest thereon, and that he be paid by Miller the further sum of $15,000 with interest from September 14, 1948. [1] He further made an alternative counterclaim to be declared the owner of 630 shares of Milmar stock on the ground that the agreement of September 14, 1948, was intended to effect a sale of only 625 shares of stock of Milmar, that he remained the owner of 480 shares of stock held by him as security for the payment to him by Miller of $50,000 which had never been paid, and that he had subsequently purchased from one Schwartz an additional 125 shares (how the total of 630 shares is arrived at is not made clear). He made a further alternative counterclaim that he be declared entitled to possession of the 625 shares of stock held in escrow, on the ground that there had been a default in making the payments due him under the *145 September 14, 1948, agreement. By way of cross-complaint Marcus made claim for an indebtedness owed to him by Milmar on account of net loans made by him over the period from July 1946 to September 1948 in the amount of $46,801.23, plus interest from various dates in 1946, 1947, and 1948. Attached to the answer and counter-claim is a list of loans alleged to have been made on various dates and a list of repayments on various dates, but there is no calculation of the interest claimed to be due. Milmar filed an answer and cross-claim on October 22, 1954, in which it alleged in effect that the essence of the agreement of September 14, 1948, was a sale by Marcus to Miller and Bierman of all his interest in Milmar, and that on completion of the transaction Miller and Bierman were to own all the stock of Milmar. It alleged that $35,500 had been paid into court by the plaintiffs and conceded that such amount was payable to Marcus. In its cross-claim Milmar asserted that by reason of the September 14, 1948, agreement any stock certificates of Milmar issued prior to September 14, 1948, were null *146 and void, and requested judgment that Marcus had no right, title, or interest in and to any such stock certificates, and that any such stock certificates be canceled. Therein it also asserted that certain proceeds of an award made in favor of Milmar by the State of New Jersey upon the condemnation of its property had been deposited in an account, and that Marcus had made claim thereto. It requested judgment that such funds be declared to be the property of Milmar and be delivered to it. It further asserted that Marcus maliciously and without justification had filed with the Bergen County clerk a notice of lis pendens, by reason of which the State of New Jersey had refused to pay Milmar the amount of the condemnation award. It therefore demanded judgment for $100,000 for malicious abuse of process and malicious prosecution, $100,000 for slander of title, $100,000 for malicious interference with prospective economic advantages, and $100,000 as punitive damages for malicious use of process. Milmar, in its answer to Marcus' cross-claim that Milmar was indebted to him for $46,801.23 alleged, among other things, that the claim was false, that any such claim was barred by the statute of *147 limitations, that all obligations had been paid, and that Marcus had released Milmar of any claim. Miller and Bierman filed a reply and counterclaim in which, among other things, they requested the court to enter judgment that the agreement of September 14, 1948, was valid, that the $50,000 note executed by Miller to petitioner had been canceled, and that Marcus owned no interest in the stock of Milmar. In 1956 the United States District Court rendered its opinion ( Bierman v. Marcus, 140 F. Supp. 66) in which it concluded, inter alia, that by the agreement of September 14, 1948, Bierman and Miller purchased all of Milmar's stock, consisting of 1,250 shares; that the full purchase price of $125,000 was payable to Marcus; that Miller contracted to pay Marcus an additional $15,000 plus 4% interest; that Marcus contracted to release Miller from his $50,000 debt evidenced by his note of June 1, 1947; and that Marcus had failed to prove that Milmar owed Marcus anything. It specifically reserved decision of the cross-claims of Milmar against Marcus involving requested money judgments. The trial in the District Court consumed 19 trial days, of which 12 days were spent *148 on the issue of loans claimed to have been made by Marcus to Milmar and on the Miller note of April 1, 1946. The decision of the District Court was appealed to the Court of Appeals for the Third Circuit which rendered its decision in 1957 vacating the judgment and remanding the cause with instruction to dismiss the complaint filed by Bierman and Miller. Bierman v. Marcus, (C.A. 3) 246 F. 2d 200. The Court of Appeals held that the plaintiffs knew that Milmar had no claim on them for the purchase price of the stock and could not assert a fictitious claim without their consent, that there had been a misuse of interpleader based on mere pretense of various claims to a fund in order to obtain adjudication of controversies other than entitlement to that fund, and that, therefore, there had been presented no bona fide issue of the type essential to an interpleader action. Upon remand, the District Court, without prejudice to the rights of the parties to pursue their respective remedies in a court of competent jurisdiction, entered its final judgment on December 14, 1959, dismissing the complaint filed by Bierman and Miller, the counterclaim of Marcus against Bierman and Miller, *149 the cross-claim of Marcus against Milmar, and the cross-claims of Milmar against Marcus, except those as to which the court had originally reserved decision. The court ordered that the total sum of $36,100 deposited with the court be returned to Bierman and Miller. During 1957 Marcus was allowed costs of $8,087.25 by the court incident to the Milmar suit. The petitioner brought suit in a state court in 1959 or sometime thereafter on his alleged loans to Milmar. The matter was settled by the parties. In 1955 the petitioner, in connection with the Milmar suit, made payments of $9,612.50 for attorney fees, $1,293.95 for court stenographer, $192.87 for other stenographers, $850 for expert witnesses, $750 for accountants, and $7.00 as court fees, or a total of $12,706.32. In 1956, in the same connection, he made payments of $16,313.75 for attorney fees, $4,500 for printing, and $79.05 for stenographer or a total of $20,892.80. In 1957, in the same connection, he made payments of $16,850 for attorney fees, $7,337.79 for printing of briefs and $400.00 for accountant, or a total of $24,587.79. In their return for the taxable year 1955 the petitioners claimed among itemized deductions *150 the amount of $14,276.72 as "Legal fees necessary to derive and protect income." In the notice of deficiency the respondent disallowed $12,426.72 of the amount claimed with the explanation "Legal expense capitalized." In their return for the taxable year 1956 the petitioners made a similar claim in the amount of $22,266.05. They also claimed among business deductions on Schedule C (profit (or loss) from business or profession) the amount of $463.38 as "Legal Fees." In the notice of deficiency the respondent disallowed $22,166.05 of the total legal fees claimed with the explanation "Legal fee capitalized", and disallowed $500 for lack of substantiation. In their petition the petitioners alleged that the amount of $22,166.05 for legal fees which the respondent disallowed as deductions represented amounts paid in connection with the Milmar suit. However, by amended petition they alleged that in 1956 they incurred and paid $20,892.05 for legal fees and expenses in connection with the Milmar suit. In their return for the taxable year 1957 the petitioners claimed among itemized deductions the amount of $7,507.26 as "Legal Expenses necessary to conserve property." In the notice of deficiency *151 the respondent disallowed the full amount claimed with the explanation that the amount constituted a capital expenditure. By amended petition the petitioners made claim for a deduction, as legal fees and expenses incurred in the Milmar suit, in the amount of $16,500.54 ($24,587.79 less court costs awarded in the amount of $8,087.25). Of the legal fees and other expenditures made in connection with the Milmar suit in the taxable years 1955, 1956, and 1957 the respective amounts of $1,300, $2,100, and $2,450 constitute expenses for the collection of income. Legal Expenses Incident to Riviera Suit Milmar's only source of income was the rent which it received from the leasing of its property to Bill Miller's Riviera, Inc., (hereinafter referred to as Riviera). Riviera operated a restaurant and night club on the leased property. Milmar had mortgage amortization of $60,000 per year. The rental to be paid by Riviera was intended to take care of the mortgage amortization, but about 1946 Riviera was having difficulty in paying its rent. Riviera was also in need of funds to hire entertainment talent for its night club. Accordingly, at the request of Miller, the petitioner in 1946 made *152 loans to Riviera. At an undisclosed time the petitioner filed suit in the United States District Court for the District of New Jersey against Riviera in which he alleged that Riviera owed him $31,422.80, representing loans made directly to Riviera and debts of Riviera paid by the petitioner upon promise of reimbursement. It was further alleged that this amount became due and payable 5 years from the year 1947. The petitioner prayed for judgment in the amount of $31,422.80 with interest and costs. In 1956 in connection with this lawsuit petitioner paid an attorney $1,500. In their return for the year 1956 this amount was included in the total legal fees and expenses claimed as deductions which were disallowed by the respondent. Legal Expenses Incident to Weimet Suit In 1946 Murray C. Weiss, Laurence Metzler, and the petitioner incorporated Weimet Film Co., Inc. (hereinafter referred to as Film Co.), and Weimet Camera Corporation (hereinafter referred to as Camera Corporation), each owning one-third of the stock of each corporation. On June 25, 1951, Metzler, Weiss, Film Co., Camera Corporation, the petitioner and 42nd Street Fotoshop, Inc. (a corporation wholly owned by petitioner), *153 entered into an agreement in which it was recited that the stock of Film Co. and Camera Corporation which was originally issued to the petitioner had been transferred by the petitioner to 42nd Street Fotoshop, Inc. Therein 42nd Street Fotoshop, Inc., agreed to sell such stock of Film Co. and Camera Corporation to those respective corporations for $6,291.70 and $7,755.76, respectively. In the agreement it was recognized that Film Co. was otherwise indebted to 42nd Street Fotoshop, Inc., and the petitioner in the amount of $38,952.54, and it was agreed that the aggregate amount of $53,000 should be paid to 42nd Street Fotoshop, Inc., as follows: $10,000 by check on execution of the agreement, and the balance in installments over a period of about 6 years, the installments to be evidenced by a series of negotiable promissory notes bearing interest at the rate of 3% per annum. In 1953 a suit was instituted in the Supreme Court of the State of New York by the petitioner and 42nd Street Fotoshop, Inc. (alleged to be a dissolved corporation of which the petitioner was the sole successor in interest [2]), against Film Co., Camera Corporation, Weiss, and Metzler. An amended complaint was filed *154 in that action on March 1, 1956, in which the petitioner alleged that at all times from October 31, 1946 to June 25, 1951, he owned and held 1/3 of all the issued and outstanding capital stock of Film Co. and Camera Corporation, and that Weiss and Metzler each owned 1/3 of such issued and outstanding stock. He alleged that as a result of fraud and deceit of Weiss and Metzler in showing him balance sheets which falsely represented the financial status of the 2 corporations, he assigned and transferred to Film Co. and Camera Corporation, through 42nd Street Fotoshop, Inc., as a dummy instrument of conveyance, all the shares of stock of those corporations that he then owned at sales prices of $6,291.20 and $7,775.76, respectively. He alleged that the stocks sold were worth at least $650,000, and demanded judgment for $635,932.54 with interest from June 25, 1951. *155 It was alternatively pleaded that petitioner, pursuant to the agreement of June 25, 1951, had transferred and assigned to 42nd Street Fotoshop, Inc., his shares of stock in Film Co. and Camera Corporation and that 42nd Street Fotoshop, Inc., in turn assigned the stock to Film Co. and Camera Corporation for $6,291.20 and $7,775.76, respectively. It was alleged that these transfers by 42nd Street Fotoshop, Inc., to Film Co. and Camera Corporation were similarly induced by fraud and deceit of Weiss and Metzler, and 42nd Street Fotoshop, Inc. demanded judgment for $635,932.54 with interest from June 25, 1951. It was also alleged that 42nd Street Fotoshop, Inc., had loaned $38,952.54 to Film Co. prior to June 25, 1951, that on or about June 25, 1951, an account was taken and stated between 42nd Street Fotoshop, Inc., and Film Co., that it was determined that there was a balance on the account in the sum of $38,952.54, that Film Co. promised and agreed to pay that amount to 42nd Street Fotoshop, Inc., that no part thereof had been paid, and that the $38,952.54 was due and owing with interest from June 25, 1951. On June 1, 1956, the suit was settled. In the settlement stipulation filed *156 with the Supreme Court of New York, Weiss, Metzler, Film Co., and Camera Corporation agreed to pay petitioner and 42nd Street Fotoshop, Inc., $80,000 in full settlement of any and all claims. The sum of $40,000 was paid at the time of settlement, and it was agreed that the balance of $40,000 would be paid in two equal installments due November 1, 1956 and April 1, 1957, with interest at 2% per annum from June 1, 1956. Petitioner paid an attorney $5,000 in 1954 and $10,049.29 in 1956 for legal fees and disbursements in the Weimet action. Petitioner paid court costs in 1956 of $164.56 in connection with such action. In their joint return for 1954, the petitioners included among itemized deductions the amount of $5,534.35 as legal expenses and fees in connection with this suit. In their joint return for 1956 they reported long-term capital gain of $34,752.86 under the description "Weimet Camera Corp. or 42nd St. Foto Shop, Inc.", showing date of acquisition as October 31, 1946, date sold as 1956, gross sales price of $44,966.71, [3] cost or other basis zero, and expenses of sale of $10,213.85 ($10,049.29 plus $164.56). Therein they also reported $333.33 as interest from "Weimet Camera *157 Corp." In the notice of deficiency the respondent disallowed the deduction of $5,534.35 claimed in the 1954 return with the explanation "Legal expense capitalized." However, in determining the *158 petitioners' tax liability for 1956 (the year in which the settlement of the Weimet action occurred) he reduced capital gain reported for that year by $2,767.17 as "representing 50% of $5,534.35, the amount of legal fees capitalized * * * in the taxable year ended December 31, 1954." In determining the deficiency for 1956 the respondent did not disturb the amount of $10,213.85 as an expense of sale in computing capital gain, as claimed by the petitioners in their return. Of the legal fees and disbursements made in connection with the Weimet suit in the taxable years 1954 and 1956, the respective amounts of $50 and $100 constitute expenses for the collection of income. Legal Expenses Incident to Condemnation Award In 1953 the City of New York acquired, by condemnation, real property belonging to petitioner located at Duane and William Streets in New York. In the condemnation proceeding petitioner was represented by an attorney who was retained on a contingent fee basis. In 1955 petitioner received an award of $136,440 plus interest of $10,379.80 from the condemnation of the real property and $500 plus interest of $39.20 from the condemnation of fixtures located on the property. *159 From the award the petitioner's attorney withheld for himself in 1955 the amount of $33,173.36. He submitted to petitioner a statement of "Fee Computation" as follows: 1. Fee @ 40% of all sums
awarded in excess of
$60,000.00
award
$136,440.00
60,000.00
Amount upon which fee is
based
$ 76,440.00
2. 40% of $76,440.00
$30,576.00
3. Applicable and apportioned inter-
est on fee of $30,576.00 @ 4%
from 10/8/53 to 5/19/55
2,446.08
$33,022.08
4. Less 19 days interest
64.60
5. Fee (pertaining to the acquisition
of the real property)
$32,957.48
6. Fee @ 40% of the fixture award
of $539.20
215.68
Total fee
$33,173.16
In addition to this fee of $33,173.16, the petitioner paid his attorney in 1955 the amount of $2,588.85 on account of disbursements made by the attorney. In their joint return for 1955 petitioners reported long-term capital gain of $54,854.91 under the description "Condemnation award-12 Duane St., N.Y.C." In calculating such gain they treated the amount of $35,762.01 ($33,173.16 attorney fee plus $2,588.85 disbursements) as expenses of the sale. Therein they also reported ordinary income of $10,960.33 as interest from "New York City *160 on Condemnation award." In their petition, petitioners allege that the respondent erred in failing to allow $2,584.33 as an ordinary and necessary expense as being the portion of the legal fee and disbursements of $35,762.01 allocable to interest received on the condemnation and reported as ordinary income. 42nd Street Fotoshop, Inc. - Interest Issue In 1938 petitioner organized and incorporated 42nd Street Fotoshop, Inc. He was the sole stockholder. The corporation was liquidated on April 30, 1952, and the petitioner received the corporation's net assets. By letters mailed to the corporation on March 15, 1954, the district director of internal revenue demanded payment of additional taxes due from it for its taxable years ended March 31, 1948, 1949, and 1950 in the respective amounts of $218.51, $198.31, and $5,611.88, or an aggregate of $6,028.70, and interest thereon to March 18, 1954, in the aggregate amount of $1,385.25. By letter of June 11, 1954, the petitioner advised the district director that the taxes in the amount of $6,028.70 had been paid by check on July 23, 1953, and that accordingly interest was due in the aggregate amount of $1,183.57 from the times that the *161 tax liabilities came into existence, namely, June 15, 1948, June 15, 1949, and June 15, 1950, respectively, until July 23, 1953. With such letter the petitioner sent his personal check in the amount of $1,183.57 in payment of the interest so calculated. In their return for the taxable year 1954 the petitioners claimed as a deduction an amount of $1,235.68 as interest paid on the Federal tax liability of 42nd Street Fotoshop, Inc.
In the notice of deficiency the respondent disallowed the claimed deduction on the ground that it constituted a payment on account of the liability of a previously liquidated corporation, but he allowed that amount as a capital loss carryover to the taxable year 1955. Opinion Issues are raised with respect to the deductibility of legal fees and expenses incurred by the petitioner in 3 legal actions, namely, the Milmar suit, the Riviera suit, and the Weimet suit. The principal contention of the petitioners is that these fees and expenses are deductible under section 212 of the Internal Revenue Code of 1954, but they also make the alternative contention that the petitioner was engaged in the business of promoting and selling business *162 corporations, that he incurred legal fees and expenses in attempting to recover loans made to some of such corporations, that such fees and expenses were proximately related to his promotion and selling business, and that therefore such fees and expenses are deductible as ordinary and necessary business expenses under section 162(a) of the Code. We will consider the alternative contention first. In Whipple v. Commissioner, 373 U.S. 193, the Supreme Court clearly pointed out that devoting one's time and energy to the affairs of a corporation, or to many corporations, is not of itself a trade or business of the person so engaged; that although such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself; and that, absent substantial additional evidence, the furnishing of management and other services to corporations for a *163 reward no different than that flowing to an investor in those corporations does not constitute the carrying on of a trade or business. The petitioners contend that the Whipple case is distinguishable since here, it is claimed, the record shows that one of the petitioner's principal objectives in entering into his many ventures was to promote the corporations, including the making of loans to them, and to sell them at a profit. In his deposition the petitioner stated, in effect, that he always took an active part in the businesses in which he was interested and that, with one exception, he had never made a "passive" investment; that when he became interested in a corporation his objective was to build a business and make a profit, and possibly sell it at a profit; and that he sometimes made loans to the corporations in which he was interested in order to build up the businesses into profitable enterprises. We have set forth in the Findings of Fact in some detail the various business enterprises in which the petitioner has shown he was interested from 1915 until the time of the trial in this case. These number about 26, of which it has been shown that 16 were in corporate form. However, *164 the pattern disclosed is not one of organizing corporations for the purpose of selling them at a profit. The petitioner testified that in the majority of cases the enterprises did not turn out profitably and that they were liquidated. It appears that generally the petitioner had held his interest, prior to liquidation, for a substantial period of time, in most instances 3 or 4 years. One enterprise which he sold in 1946 had been held for 31 years. At the time of trial in this case, he owned interests in 4 corporations which he had held for periods of about 20 or 30 years. Actually, the evidence shows no more than 4 sales of corporate interests. On two of these sales, the Weimet corporations, the petitioner reported long-term capital gains, and the record does not show how the other two were treated for tax purposes. The petitioner testified that his purpose in setting up the various corporations was to build them up "to a position of value and sell out or continue, whichever seems to be more profitable." He stated that he received salary from a few of the corporations, but that from many he did not. There is no evidence to show to what extent any of the corporations paid him dividends. *165 Upon the record presented we must conclude that the petitioner was not engaged in carrying on a business of promoting corporations for the purpose of sales of the stock thereof, and that the legal fees and expenses incurred by him in connection with the collection of loans made by him to the corporations involved are not deductible as ordinary and necessary expenses incurred in a trade or business carried on by him. As stated, the petitioner's principal reliance is upon section 212 of the Code which provides in part: In the case of an individual, there shall he allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or * * *
There are set forth in the margin pertinent provisions of section 1.212-1 of the Income Tax Regulations.[4]
*166 The origin of the statutory provisions above quoted is section 121(a) of the Revenue Act of 1942, which enacted section 23(a)(2) of the Internal Revenue Code of 1939. Prior thereto section 23(a)(1) allowed deductions only for expenses incurred "in carrying on any trade or business." The intention of Congress in enacting the new provisions was to provide for a class of deductions coextensive with the business deductions allowed by section 23(a)(1), except for the requirement that the income-producing activity qualify as a trade or business. Sections 23(a)(1) and 23(a)(2) of the 1939 Code (and hence sections 162(a) and 212 of the 1954 Code) are in pari materia. United States v. Gilmore, 372 U.S. 39. In enacting these provisions Congress made it clear that the deduction for nonbusiness expenses is subject, except for the requirement of being incurred in connection with a trade or business, to all the restrictions and limitations that apply in the case of the deduction of an expense paid or incurred in carrying on a trade or business. H. Rept. No. 2333, 77th Cong., 2d Sess., p. 75; S. Rept. No. 1631, 77th Cong., 2d Sess., p. 88; and United States v. Gilmore, supra. *167 One of the restrictions or limitations upon the deductibility of both business and nonbusiness expenditures is that expenditures which are capital in nature [5] are not deductible as ordinary and necessary expenses. Bowers v. Lumpkin, (C.A. 4) 140 F. 2d 927, certiorari denied 322 U.S. 755; Robert L. Wilson, 37 T.C. 230, affd. (C.A. 5) 313 F. 2d 636; Iowa Southern Utilities Co. v. Commissioner, (C.A. 8) F. 2d , affirming a Memorandum Opinion of this Court; and Commissioner v. Doering, (C.A. 2) F. 2d , affirming 39 T.C. 647. As we stated in the Wilson case: A capital expenditure is not regarded as a charge against current income and is not deductible as an "ordinary and necessary expense," whether it is made in the course of business or whether it is made in relation to the nonbusiness situations specified in section 23(a)(2) of the 1939 Code and section 212 of the 1954 Code. Bowers v. Lumpkin, supra, at 928-929; Louisiana Land & Exploration Co., 7 T.C. 507, 515, affirmed 161 F. 2d 842 (C. *168 A. 5); Safety Tube Corporation, 8 T.C. 757, 762-764, affirmed 168 F. 2d 787 (C.A. 6). The mere fact that the new provisions refer to expenses for the "management, conservation, or maintenance of property held for the production of income" does not dispense with the limitation that the deduction is not allowable in the case of capital expenditures. Those new provisions merely define the area in which nonbusiness expenses may be deducted provided that they otherwise satisfy the conditions for deductibility, one of those conditions being that the expenditure must not be capital in nature. Legal Expenses Incident to the Milmar Suit In the taxable years 1955, 1956, and 1957 the petitioner paid attorney fees and other expenses in the amounts of $12,706.32, $20,892.80, and $24,587.79, respectively, *169 in connection with the Milmar suit. We have set forth in the Findings of Fact in considerable detail the rather complex issues raised in the Milmar suit and will refer to them here only briefly. The suit at its inception was one brought by Bierman and Miller to require the petitioner and Milmar to interplead in order that the court might determine which of them was entitled to the amount of $35,000, the remaining unpaid portion of the selling price of stock, with interest thereon. The petitioner's answer to the complaint was that Milmar had never made any claim thereto and that the suit was not brought in good faith, and he therefore requested that the complaint be dismissed. However, by way of counterclaim he alleged that the original sale was induced by fraud and requested that the court hold him to be the owner of not only the stock which was subject to the sale, but also of all the outstanding stock of Milmar, offering to repay the $90,000 of the purchase price which he had already received. However, he counterclaimed, in the alternative, for the payment to him of the $35,000, plus interest, and for the payment to him by Miller of $15,000, plus interest, in the event the court *170 should hold that the original sale was valid. He cross-claimed for the payment to him by Milmar of $46,801.23, plus interest, on account of loans alleged to have been made by him to Milmar. Milmar conceded that the sale of the stock was a sale by the petitioner, and that the petitioner was entitled to the $35,000, plus interest, but filed a cross-claim against petitioner for judgment of $400,000 on account of the petitioner's having filed a notice of lis pendens, as a result of which Milmar was unable to receive payment of a certain condemnation award. The litigation continued over a number of years, the suit having been filed in late 1950 and the final judgment having been rendered in 1959. The result of the litigation was a dismissal of all the complaints, counterclaims, and cross-complaints, except that having to do with the claim of Milmar against the petitioner for money damages, as to which the court had originally reserved decision. Although in his petition in the instant case the petitioner claimed that all amounts expended in connection with the Milmar suit are deductible, it is clear that on brief he makes claim that only portions of such expenditures are deductible. On *171 brief it is his position that in the Milmar suit he was attempting, among other things, to collect debts owed him by Milmar and Miller arising from loans which he had made to them, plus interest, that this was the main substantive issue in such suit, that 12 of the 19 days of the trial were devoted to these claimed debts, and that therefore twelve-nineteenths of the expenditures is deductible as ordinary and necessary expenses paid either for the production or collection of income or for the management, conservation or maintenance of property held for the production of income, within the meaning of section 212 of the Code. The respondent contends that the expenditures were incurred in litigation which primarily involved the sale of stock and an attempted rescission of the sale, and that such expenditures are capital in nature and nondeductible. He recognizes that portions of the expenditures were for the collection of debts, but also contends that such portions are nondeductible. He further contends that in any event the petitioner has not met his burden of showing any proper allocation as between deductible items and nondeductible items. It is his position that an allocation based *172 on the number of trial days devoted to the collection of loans is not proper for the reason that it does not take into account pre-trial and appear expenses, and apparently for the reason that any expenditures attributable to attempts to recover the principal of the loans are not deductible. It should be pointed out that the only loan made to Miller was the $50,000 loan made in order that Miller could make his contribution to the capital of Milmar at organization. In the suit the petitioner did not attempt to collect that loan but claimed that since the loan had not been repaid he was entitled to ownership of the stock of Milmar held by Miller. The petitioner did, however, in his cross-claim in that suit allege that he had made loans totaling $46,801.23 to Milmar at various dates in 1946, 1947, and 1948, and he made claim for repayment thereof with interest from the various dates the loans were alleged to have been made. The petitioner did not, as a result of this suit, collect any of the alleged loans or interest thereon, since the suit was dismissed. The dismissal was without prejudice to the rights of the parties to pursue their remedies in a court of competent jurisdiction. In *173 a later year the petitioner did bring suit in a state court for collection of the alleged loans due from Milmar and such suit was settled. We are not advised as to the details of the settlement. In Daniel S. W. Kelly, 23 T.C. 682, we held that the portion of attorney fees and other expenditures incurred in connection with a suit to collect interest on a loan was deductible as expenses for the collection of income, but that the portion attributable to the collection of the principal of the loan was not deductible. Our decision was affirmed in Kelly v. Commissioner, (C.A. 7) 228 F. 2d 512, with respect to the disallowance of the portion attributable to the recovery of the principal of the loan, the court holding that costs of recovering capital are not deductible expenses. See also Helvering v. Stormfeltz, (C.A. 8) 142 F. 2d 982. The issue as to deductibility of the amount attributable to collection of the interest was not raised on appeal in the Kelly case. In the Kelly case the suit resulted in the collection of both principal and interest, and *174 the expenditures were allocated between principal and interest in approximately the proportion of principal and interest recovered. See also Helvering v. Stormfeltz, supra.As stated, in the instant case the expenditures in question did not result in the recovery of either principal or interest. However, we think that to the extent the expenditures were made pursuant to a claim for interest they should be considered as expenses incurred for the collection of income within the meaning of section 212. However, following Kelly v. Commissioner, supra, we hold that the portion of the fees and other expenses attributable to the claim for recovery of the principal of the loans is not deductible. See also Helvering v. Stormfeltz, supra.The petitioner urges that such portion should be held deductible since the recovery of the alleged loans could only result in the recovery of money, rather than any asset or assets to which such costs could attach as additions to basis. However, a similar contention was rejected in Daniel S. W. Kelly, supra.And see Kelly v. Commissioner, supra.See also Helvering v. Stormfeltz, supra. *175 [6] No issue is raised as to whether such portion is deductible under any other section of the Code. From the record it is obvious that a substantial portion of *176 the attorneys fees and other expenditures incurred in the Milmar suit had to do with the petitioner's claim for a rescission of the stock sale. Such portion would clearly be of a capital nature and hence nondeductible. Munson v. McGinnes, (C.A. 3) 283 F. 2d 333, certiorari denied 364 U.S. 880, and Spangler v. Commissioner, (C.A. 9) 323 F. 2d 913, affirming a Memorandum Opinion of this Court. Substantial portions are also attributable to the petitioner's request that he be adjudged the owner of all the remaining outstanding stock of Milmar and to his defense against the cross-claim of Milmar for money damages for alleged malicious filing of a notice of lis pendens. Clearly such portions do not constitute deductible expenses under section 212. Indeed, on brief the petitioner does not contend that any amounts attributable to any of the foregoing issues are deductible under section 212. [7] On the record presented it is not possible to determine with precision the portion of the legal fees and other expenditures attributable to the foregoing issues and the portion attributable to the petitioner's claim for interest due. Although the attorney who *177 represented petitioner in the Milmar suit testified as to the amount of legal fees and other expenditures and as to the amount of trial time devoted to the issue of loans, he did not make any allocation of the fees and expenditures among the various issues raised in the suit. We agree with the respondent that an allocation based upon the trial time devoted to the loans would not correctly fix the amount of the fees and expenditures which are deductible, namely, the portion attributable to the claim for interest. Upon the record we can make only a rough approximation of the amount so attributable, but we feel it incumbent upon us to make the best estimate we can. Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540. This we have done, bearing heavily against the petitioner upon whom rests the burden of proof, and have found as a fact that of the legal fees and other expenditures made in connection with the Milmar suit in the taxable years 1955, 1956, and 1957, the respective amounts of $1,300, $2,100, and $2,450 constitute expenses for the production or collection of income, which are deductible under section 212 of the Code. *178 Legal Expenses Incident to Rivera Suit In 1956 the petitioner paid an attorney $1,500 for services in connection with his suit against Bill Miller's Riviera, Inc., in which it was alleged that Riviera owed him $31,422.80, representing loans made directly to Riviera and debts of Riviera paid by the petitioner upon promise of reimbursement. In such suit petitioner prayed for judgment of such amount, plus interest and costs. The record is devoid of evidence as to the outcome of such suit. It is the petitioner's contention that the full amount of $1,500 is deductible under section 212 of the Code, his arguments being similar to those made with respect to the expenditures made for collection of loans and interest in the Milmar suit. For the reasons stated above with respect to the Milmar suit, any portion of the fee properly allocable to the collection of interest would constitute a deductible expense under section 212, but the remainder would not be deductible under section 212. The petitioner in the Riviera suit did not request a specific amount of interest, nor did he therein state the period for which interest was due. We do not even know the date the suit was filed. The record *179 therefore does not contain any basis whatever for making even a rough estimate of the portion, if any, of the legal fees which are properly attributable to the claim for interest. We must conclude that the petitioner has not met his burden of showing error in the respondent's determination in this respect, and such determination is approved. Legal Expenses Incident to Weimet Suit In their joint income tax return for the taxable year 1954 the petitioners claimed among itemized deductions an amount of $5,534.35 as legal fees and expenses paid in connection with the Weimet suit. This deduction was disallowed by the respondent, but the amount of $5,534.35 was taken into account by him in computing capital gain for the year 1956 upon settlement of the Weimet suit. It has been stipulated that the actual amount of the legal fees and disbursements was $5,000 instead of $5,534.35. In 1956 the petitioners paid legal fees and disbursements of $10,049.29 and court costs of $164.56 in connection with the Weimet suit. In their return for that year they treated this aggregate amount of $10,213.85 as expenses of sale in computing a long-term capital gain of $34,752.86 derived as a result of the *180 settlement of the Weimet suit. The transaction giving rise to such long-term capital gain was referred to in the return as "Weimet Camera Corp. or 42nd Street Foto Shop, Inc." The respondent in the notice of deficiency did not disturb the petitioners' treatment to the return of the amount of $10,213.85 as an expense of sale. The petitioners now contend that the legal fees, disbursements, and court costs paid in 1956, as well as the legal fees and disbursements paid in 1954, are deductible as ordinary and necessary expenses under section 212 of the Code. They rely principally upon Otto Dacring, Jr., supra. In the Doering case the taxpayer owned 20% of the stock of Argosy Pictures Corporation which had a contract with Republic Pictures Corporation for the latter to distribute and exhibit 3 pictures which Argosy was to produce, Argosy to receive a specified portion of Republic's profits from distribution and exhibition. A dispute arose as to the amount payable by Republic to Argosy. Over a 3-year period Argosy paid substantial fees and disbursements to attorneys representing it in the dispute. In January, 1956, Argosy was dissolved, cach of its stockholders receiving an amount of cash *181 (the taxpayer's share being $12,822.05) and a share in the claim against Republic, which claim had no ascertainable market value at that time. The former stockholders retained the same law firm that had represented Argosy to effect collection from Republic. A final settlement was effected in December 1956, whereby an additional amount was paid by Republic, the taxpayer's share being $108,000. The taxpayer's share of legal and banking fees was $6,750. In his return the taxpayer reported the excess of $120,822.05 over the basis of his stock as long-term capital gain from the sale or exchange of a capital asset. He deducted the amount of $6,750 as ordinary and necessary expenses paid for the production or collection of income under section 212(1) of the Internal Revenue Code of 1954. The respondent disallowed the deduction, taking the position that where contractual rights having no ascertainable fair market value are received in liquidation of a corporation the transaction remains open, that when some payment is subsequently realized the payment is treated as an amount received in exchange for the stock of the liquidated corporation, and that expenses incurred *182 in connection with such subsequently received amounts are in the nature of expenses of a sale or exchange and as such merely reduce the amount of gain arising from the exchange. We there held that expenses were incurred for the sale purpose of collecting sums claimed to be due the taxpayer under a fully executed and enforceable contract which he had received as assignee of Argosy, that they were not incurred to effect a disposition of his stock in Argosy, and that they were properly deductible under section 212(1) of the Code. On brief the petitioner contends that the situation here presented comes precisely within the Doering case, and that therefore the legal fees and disbursements are deductible expenses. He maintains that on April 30, 1952, the petitioner received all the assets of 42nd Street Fotoshop, Inc., in liquidation, that included in these assets was a claim against the Weimet suit defendants for monies loaned and for increased price of stock because of fraud of the purchasers, and that such claim had no ascertainable fair market value at the date of liquidation. He states that, as in the Doering case, the suit was for the collection of an interest in a claim already *183 distributed to him. We cannot agree that the instant situation is analogous to that presented in the Doering case. While it is true that 42nd Street Fotoshop, Inc., was liquidated in 1952, the evidence presented does not establish that in such liquidation the petitioner received a claim for the selling price of the stock of Film Co. and Camera Corporation or a claim for money loaned by 42nd Street Fotoshop, Inc. to Film Co. Such evidence as we have tends to show that the stock of Film Co. and Camera Corporation was owned by the petitioner and was sold by him. In his deposition the petitioner stated that he sold the stock of Film Co. and Camera Corporation to his associates in 1951. Furthermore, the petitioner's return for 1952 contains information indicating that in his 1951 return he treated the sale of the stock of Camera Corporation as a sale by him, reporting a capital gain upon the transaction. Furthermore, in the amended complaint filed in the Weimet suit it was alleged that the petitioner had sold the stock through 42nd Street Fotoshop, Inc., as a dummy instrument of conveyance. With respect to the loan, the agreement of June 25, 1951, recites that Film Co. was indebted to *184 42nd Street Fotoshop, Inc., and the petitioner in the amount of $38,952.54, and the deposition of the petitioner seems to indicate that it was he who made the loans. There has been no showing that the petitioner, in reporting his gain in 1952 upon the liquidation of 42nd Street Fotoshop, Inc., included any amounts as representing the value of any claim of 42nd Street Fotoshop, Inc., against Film Co. on account of loans. Such evidence as we have indicates that the petitioner treated the loan as being one which he had made to Film Co. Thus, in his return for 1956, in computing the capital gain upon the settlement of the Weimet suit for $80,000, he did not treat the full $80,000 as being received in liquidation. Rather, he subtracted the amount of the debt from the $80,000 received, in arriving at the "gross sales price" of the stock, and he did not report the $38,952.54 as taxable income. This would indicate that he considered $38,952.54 of the $80,000 settlement as the repayment of his loan (rather than a loan made by 42nd Street Fotoshop, Inc.) and hence not taxable income to him. Under the circumstances, it must be considered that in the Weimet suit the petitioner was attempting to *185 collect a loan made by him to Film Co. and was attempting to revise the selling price of stock which he had sold, and that the Doering case has no direct bearing in determining the deductibility of the legal fees and disbursements incurred in the Weimet suit. Insofar as the petitioner, in the Weimet suit, was attempting to revise the terms of sale of the stock, the instant case is similar to Munson v. McGinnes, supra, and Spangler v. Commissioner, supra, in which it was held that litigation expenses incurred in suits resulting in a revised selling price, because of fraud in the initial transaction, are not deductible as expenses but are properly to be treated as capital expenditures to be taken into account in computing the gain realized upon the sales. In Munson v. McGinnes, supra, the court stated in part: More analytically, if terms of sale have been agreed and subsequent controversy concerns no more than enforcement of these terms against a defaulter the problem is one of "collection". Naylor v. Commissioner, 5th Cir. 1953, 203 F. 2d 346. If the problem is to reach mutually satisfactory or binding terms of sale, the problem *186 is one of disposing of the property, not of collection, and the question of capitalization must be faced. Here there was no dispute as to what the original terms of sale were and no difficulty in obtaining the buyer's compliance with them. Rather, there was a successful effort to establish that the original terms of sale were so unjust as a result of underlying fraud that equity should require their modification to provide the seller a larger consideration. We need not say, as the government urges, that the seller reacquired and resold the stock to conclude that what occurred was in substance and reality an equitable revision of the original terms of sale. Thus, the counsel fee in question was, to one in the seller's position, an expense of modifying terms of sale, incurred as an essential incident of a capital transaction in the disposition of property. * * * Insofar as the petitioner, in the Weimet suit, made claim for repayment by Film Co. of a loan of $38,952.54, with interest, the situation is similar to that involved in the Milmar suit. As pointed out hereinabove with respect to the Milmar suit, any portion of the legal fees and disbursements attributable to the claim for *187 recovery of the principal of the loan is not deductible under section 212, but any portion thereof properly attributable to the claim for interest due is deductible under such section. In the Weimet suit the petitioner made claim for interest on the $38,952.54 from June 25, 1951. In the settlement agreement the amount of the settlement, $80,000, was not segregated, but it was agreed that it was in settlement of all claims. Here again we are confronted with the problem of making a rough approximation of the amount of the legal fees and disbursements which are attributable to the claim for interest on the loan. It is obvious that only a small portion is so attributable. In the exercise of our best judgment we have concluded and have found as a fact that of the amount of $5,000 paid by the petitioner in 1954 for legal fees and disbursements, $50 is attributable to the claim for interest, and that of the $10,213.85 of such fees and disbursements incurred in 1956, $100 is so attributable. These amounts are deductible under section 212(1) of the Code, and the remainder of such fees and disbursements are not deductible. Legal Expenses Incident to Condemnation Award In his return for *188 1955, the petitioner treated the total amount of legal fees and disbursements paid to his attorney in the condemnation case in the amount of $35,762.01 as an expense of the sale of the condemned property, thereby reducing his gain upon the sale. On brief he contends that of the $35,762.01 the amount of $2,770.61 should be treated as a deduction under section 212(1) as being the part of the fee paid for collection of interest on the award. The respondent conteds that no part of the amount of $35,762.01 represents a deductible expense for tax purposes, and that such amount was properly treated as a capital expenditure which reduced petitioner's capital gain on the transaction. Whether any portion of attorney fees and other expenses are to be considered as ordinary and necessary expenses for the production or collection of income is to be determined upon the circumstances in each case. In the instant case the evidence does not disclose any details regarding the services which were rendered by the attorney in connection with the condemnation proceeding. All we know is that the attorney was retained on a contingent fee basis, that as a result of the proceeding the petitioner received *189 from the City of New York an award of $136,440, plus interest of $10,379.80, from the condemnation of the tral property and $500, plus interest of $39.20, from the condemnation of fixtures tocated on the property, and that the attorney based his fee upon a percentage of the award for the real property taken, and not upon the interest upon such award. This would seem to indicate that it was considered that interest was merely incidental to the award and that no charge was made by the attorney for the collection of interest. In this connection it should be observed that upon the condemnation of property in New York City interest upon an award accrues as a matter of right from the date of the taking of the property, by virtue of the constitution and the statutes of the State of New York and the administrative code of the City of New York. See Wood-ward-Brown Realty Co. v. City of New York, 197 N. Y. S. 162, reversed on other grounds, 235 N. Y. 278, 139 N.E. 267; and In Re Bronx River Parkway In City of New York, 259 App. Div. 552, 20 N. Y. S. 2d 53, affd. 284 N. Y. 48, 29 N.E. 2d 468. See also Kieselbach v. Commissioner, 317 U.S. 399. *190 Under the circumstances, we must conclude that no portion of the legal fee and disbursements is deductible as being attributable to the collection of interest on the award. Rather, the full amount of the legal fee and disbursements is deductible from the award for the property in computing the capital gain or loss upon the transaction. See William Justin Petit, 8 T.C. 228. On this issue we hold for the respondent. In his brief the petitioner makes an alternative argument that at least $2,446.08 of the amount paid to his attorney in the condemnation proceeding is deductible as interest under section 163 of the 1954 Code. This is based upon the fact that the attorney's fee statement contains an item of $2,446.08 as "interest on fee of $30,576.00 @ 4% from 10/8/53 to 9/19/55." However, the pleadings do not raise the issue of the deductibility of this amount as interest paid. In any event petitioner has failed to show that he was under any obligation to pay any interest to his attorney on the contingent fee or that the amount of $2,446.08 was anything but one of the factors used by the attorney in fixing the amount of the fee charged. 42nd Street Fotoshop, Inc. - Interest *191 Issue In their return for the taxable year 1954 the petitioners claimed as a deduction an amount of $1,235.68 as interest paid on the Federal income tax liability of 42nd Street Fotoshop, Inc. On brief they concede that the total amount of such interest paid was $1,183.57, and that this represented interest from the dates that the tax liabilities of the corporation arose until July 23, 1953. They also concede on brief that the portion of this amount which represents interest on the corporate tax liability accruing prior to the date of the liquidation of the corporation, which liquidation date they claim was April 30, 1952, is not deductible by them, but maintain that the portion representing interest accruing after the date of liquidation is deductible, citing Floyd C. Ewing, 27 T.C. 406, affd. per curiam (C.A. 6) 254 F. 2d 600, and Koppers Co., 3 T.C. 62, affd. (C.A. 3) 151 F. 2d 267. The respondent on brief concedes that any amount of interest paid by a transferee as interest after receipt of corporate assets is deductible by the transferee as his interest liability, but maintains that in the instant case the petitioner *192 has not shown that he is entitled to any deduction on account of interest paid. The respondent argues that there has been no proof that the petitioner had paid the tax liability of $6,028.70 as recited in his letter, and that there has been no showing that the petitioner requested that the payment which he now claims to have made in the amount of $1,183.57 be applied on the interest liability. He further contends that the petitioners have failed to show that the corporation was liquidated on April 30, 1952, as claimed, or, indeed, that the corporation has ever been liquidated. It is true that the petitioners have not shown that the tax liability of the corporation had been paid. Thus, so far as the record shows, there was outstanding, at the time the petitioner made payment of $1,183.57, both a tax liability and a liability for interest thereon. However, to the extent of the interest liability a payment will be considered as payment of such interest if the debtor so designates. Rev. Rul. 58-239, 1958-1 C.B. 94. See also James F. Keith, 35 T.C. 1130. The petitioner's letter of June 11, 1954, addressed to the district director, clearly designates the payment *193 of $1,183.57 as a payment of interest accrued up to July 23, 1953. It is clear from the record that there was in existence at that time an interest liability equal to the amount of the check. Accordingly, to the extent that the $1,183.57 represented interest accrued after the liquidation of the corporation, it would represent deductible interest paid by the petitioners. In their petition the petitioners allege that the corporation was liquidated on April 30, 1952, and in his answer the respondent admits that it was liquidated, but does not admit that date. In his deposition the petitioner testified that the corporation was dissolved in 1952. He was shown a copy of his income tax return for the taxable year 1952 in which it was indicated that the dissolution of the corporation occurred on April 30, 1952, and he testified that the return accorded with his recollection. Under the circumstances, we have found as a fact that the corporation was liquidated on April 30, 1952. In connection with the recomputation under Rule 50, the portion of the amount of the payment of $1,183.57 which represents interest accrued after April 30, 1952, will be determined and allowed as a deduction for *194 the taxable year 1954. Floyd C. Ewing, supra, and Koppers Co., supra. In the statutory notice for the taxable year 1956, respondent disallowed a deduction of $500 with the explanation "Legal fee not substantiated." Petitioner has not argued this point in opening statement or on brief. Respondent on brief treats the issue as abandoned. We consider the issue abandoned and we therefor sustain respondent's determination. The petitioners concede that they are liable for an addition to tax for the taxable year 1956 under section 6651(a) of the Code for failure to timely file a return. The amount of the addition will be computed in connection with the recomputation under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. Actually Miller had paid $8,800 of this amount prior to the commencement of the suit.↩
2. In their joint income tax return for the taxable year 1952 the petitioners reported long-term capital gain of $16,560.43 upon liquidation of 42nd Street Fotoshop, Inc., showing the receipt of assets of a value of $96,305.44 (no details of such assets being shown). A schedule attached to such return relating to capital loss carryover shows that in 1951 the petitioner treated the sale of Weimet Camera Corporation stock as a sale by him and that he had included in his return for 1951 a net long-term gain of $3,877.88 on account of such sale.↩
3. In their petition herein the petitioners state that the figure of $44,966.71 represents the excess of $80,000 over the unpaid loans due from the defendants. Actually the amount of unpaid loans alleged in the amended complaint was $38,952.54 and the difference between that figure and $80,000 is $41,047.46. This discrepancy is not explained, but is not of importance here. It should be added that the amount of $44,966.71 which the petitioners reported as gross sales price included the $20,000 installment which was due on April 1, 1957. In their petition the petitioners contend that this was in error and that such $20,000 should not have been included in gross sales price received in 1956. The respondent in issuing the notice of deficiency for 1957 included such $20,000 as a part of gross sales price received in that year. The parties have agreed that such $20,000 is properly to be taken into account in 1957 and is to be eliminated from the calculation of capital gain received in 1956.↩
4. Section 1.212-1 of the Income Tax Regulations provides in part as follows: (b) The term "income" for the purpose of section 212 includes not merely income of the taxable year but also income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. For example, if defaulted bonds, the interest from which if received would be includible in income, are purchased with the expectation of realizing capital gain on their resale, even though no current yield thereon is anticipated, ordinary and necessary expenses thereafter paid or incurred in connection with such bonds are deductible. * * *
(d) Expenses, to be deductible under section 717 must be "ordinary and necessary". Thus, such expenses must be reasonable in amount and must bear a reasonable and proximate resation to the production or collection of taxable income or to the management, conservation, or maintenance of property held for the production of income. * * *
(k) Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents. * * *
(n) Capital expenditures are not allowable as nontrade or nonbusiness expenses. The deduction of an item otherwise allowable under section 212 will not be disallowed simply because the taxpayer was entitled under subtitle A of the Code to treat such item as a capital expenditure, rather than to deduct it as an expense. * * * Where, however, the item may properly be treated only as a capital expenditure * * * no deduction is allowable under section 212↩; and this is true regardless of whether any basis adjustment is allowed under any other provision of the Code.
5. Section 263 of the Internal Revenue Code of 1954↩ provides in part that no deduction shall be allowed for "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."
6. The petitioner makes the further argument that the legal fees and other expenditures attributable to the collection of the alleged loans should be considered as expenses for the management, conservation or maintenance of property held for the production of income, namely, his investment in the stock of Milmar, since, he states, the alleged loans to Milmar and to Miller were originally made for the purpose of assuring the survival of Milmar. We see no merit in this argument. To come within this provision of the statute the expenditures must bear a proximate relation to the management, conservation or maintenance of property held for the production of income. See section 1.212-1(d) of the Income Tax Regulations↩, and H. Rept. No. 2333, 77th Cong., 2d Sess., p. 75. The petitioner did not, at the time of the suit or at the time the expenditures were made, own a stock interest in Milmar, and there is only a remote relationship between the expenditures and his original ownership of Milmar stock.
7. Nor does the petitioner contend that any portion of the amounts in question is attributable to his defense of his right to the remaining $35,000 of the selling price of the stock, plus interest, and the balance due from Miller, plus interest. In this connection it seems apparent that there was no real controversy in these respects. Milmar admitted that it had no claim to the sale proceeds, plus interest, and apparently Miller did not dispute his liability to petitioner.↩